UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ROBERT L. MURRAY,

    Petitioner,

        v.                              CAUSE NO. 3:23-CV-176-HAB-JEM

WARDEN,

    Respondent.

## ORDER

Robert L. Murray, a prisoner without a lawyer, filed a habeas corpus petition challenging a disciplinary decision (WCC-22-6-226) at the Westville Correctional Facility in which a disciplinary hearing officer (DHO) found him guilty of attempted trafficking in violation of Indiana Department of Correction Offenses 111 and 113. Following a hearing, he was sanctioned with thirty days earned credit time and a demotion in credit class.

Murray argues that he is entitled to habeas relief because the administrative record lacked sufficient evidence to support the finding of guilt.

> [T]he findings of a prison disciplinary board [need only] have the support of some evidence in the record. This is a lenient standard, requiring no more than a modicum of evidence. Even meager proof will suffice, so long as the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary. Although some evidence is not much, it still must point to the accused's guilt. It is not our province to assess the comparative weight of the evidence underlying the disciplinary board's decision.

*Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000).

Departmental policy defines trafficking as "Giving, selling, trading, transferring, or in any other manner moving an unauthorized physical object to another person; or receiving, buying, trading, or transferring; or in any other manner moving an unauthorized physical object from another person without the prior authorization of the facility warden or designee." ECF 12-7 at 2. The administrative record includes a conduct report in which Investigator Mapps represented that Murray transferred money to Officer Conley through an individual named "Chello" for the purpose of receiving suboxone strips. ECF 12-1. It includes a portion of the investigative report in which Investigator Mapps represented that she interviewed Officer Conley and Murray on June 1, 2022. ECF 12-2. The investigative report includes transcripts of the following telephone calls:

> **May 27, 2022, at 8:31 a.m. from Murray to his sister, LaToiya Murray, and individual Murray called "Chello":** Murray asked to speak to Chello . . . He told his sister that he appreciates everything she has done, but he respects her being smart. Sister (LaToiya) tells Murray that she still would, but she can't jeopardize her business(es). Chello gets on the phone . . . Murray tells Chello that a buck just came through . . . . Chello checked and confirmed transaction . . . Murray told him (Chello) to send it to the person he sent $185 to, and gave the initial MC, and told Chello not to say the name out loud . . . As Chello was checking, Murray asked if the name started with C-O-N? Murray instructed Chello to send the following message with the transaction "From Red (Murray's nickname) for 50 Girls" (code for Suboxone strips).
>
> **June 1, 2022, at 6:26 a.m. from Murray to his sister, LaToiya Murray:** Murray told sister, "I'm upset because I was supported to . . . You feel me?," Murray stated, "This bitch so out there, she didn't even make it . . . You know what I'm saying right? Murray said, Imma have to have bro . . . Sister says, "Request it back? Murray tells sister he thinks he knows what happened. Some shit went wrong, shorty . . . Murray said, "I think some shit went sideways, and I may not be able to get my bread back." Murray then said, "I just heard something that was bad news, I was just in the

2

> window and saw the dogs." Murray said, "A muthafucka was supposed to be careful with investing too much because of her habits." Murray got off of the phone, he is head speaking to someone in the background (can't make out what the other person is saying.) He asks, "Did she call off or is she late?" Murray told his sister, "She just like Tasha, I was trying to tell her how to do shit, she was saying she know."

*Id.* The conduct report and the telephone conversations constitute some evidence that Murray attempted to commit trafficking as defined by departmental policy.

Murray maintains that the administrative record contains no evidence to suggest that he used the word "girls" during his telephone conversation to refer to suboxone. However, Investigator Mapps relied on her experience as a correctional investigator to interpret Murray's ambiguous language and furtive manner of speaking. ECF 12-2. Even setting aside Investigator Mapps' expertise, the contents of the telephone conversation adequately support the finding that Murray had attempted to engage in trafficking. According to these conversations, Murray sent money to someone with a name that started C-O-N in exchange for "50 Girls." It is not plausible that Murray expected anyone to literally deliver "50 girls" to him at the prison. On the morning of Officer Conley's interview with internal affairs, Murray complained about a woman – presumably Officer Conley -- who did not arrive at work as usual and that something went wrong that caused him to lose his ability "to get his bread back" or to recoup his investment. The reference to getting his "bread back" further suggests that the woman was bringing him something he could sell from inside the prison but had been somehow intercepted. These conversations strongly suggest that Murray expected Officer Conley to bring him something that he could sell from inside the prison on June

3

1, 2022, in exchange for the money he sent her on May 27, 2022. There is no indication that Murray had prior authorization to receive any objects from Officer Conley for resale, so there would be some evidence to support the finding of guilt regardless of whether "50 Girls" referenced suboxone strips or some other kind of object. Therefore, this claim is not a basis for habeas relief.

Murray argues that he is entitled to habeas relief because the hearing officer was not an impartial decisionmaker. He maintains that the hearing officer was biased because she incorrectly found that he pled guilty and because she did not conduct her own investigation. In the prison disciplinary context, adjudicators are "entitled to a presumption of honesty and integrity," and "the constitutional standard for improper bias is high." *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003). "Due process does forbid officials who are directly or substantially involved in the factual events underlying the disciplinary charges, or the investigation thereof, from serving on the board hearing the charge." *Id.* at 667. Participating in an investigation of the conduct report would have disqualified the hearing officer from serving as a hearing officer, so the court cannot find that a hearing officer's refusal to investigate suggests improper bias. Additionally, though the hearing officer may have incorrectly found that Murray pled guilty, adverse rulings alone are insufficient to demonstrate improper bias. *Thomas v. Reese*, 787 F.3d 845, 849 (7th Cir. 2015). As a result, the claim of improper bias is not a basis for habeas relief.

Murray also argues that he is entitled to habeas relief because he did not plead guilty as indicated by the hearing officer on the hearing report.[1] Notably, the guilty plea did not prevent Murray from obtaining a hearing. ECF 12-4. To the contrary, departmental policy provides that disciplinary proceedings may be held by the screening officer in cases where inmates plead guilty. ECF 12-8 at 23-24. According to the petition, the principal harms included the inability to request evidence, including a statement from Officer Conley and a video recording of his interview with Investigator Mapps, and the consideration of his guilty plea in finding him guilty. He maintains that the video recording would have shown that he did not admit to sending money to Officer Conley. He also asserts that the hearing officer did not consider his statement that Investigator Mapp fabricated the conduct report in retaliation for "not having information to disclose against other offenders."

"[T]he inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). However, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.*

---

[1] The Warden submitted an affidavit from the hearing officer in which she disputes Murray's account and indicates that Murray did plead guilty. ECF 12-9. However, for purposes of this order, the court assumes without deciding that the hearing officer erroneously determined that Murray pled guilty.

5

The portion of the investigative report in the administrative record states that "Offender Murray denied that Conley was bringing in anything for him. He stated that he tried to help her find a place and he also gave her money, but not for trafficking." ECF 12-2. To Murray's point, the completed investigative report contains a more thorough account of the interview and does not indicate that Murray admitted to giving Officer Conley money. ECF 14. Instead, it details several of his statements to the effect that he intended to send her money and other potentially incriminating statements indicating that he knew the investigator had listened to his telephone conversations, that he believed the investigator interviewed him based on suspicions that "he may have had something to do with the young lady that [they] made leave," that "anything he gave her was a gift," and that "if she got caught with something, it was not for him unless it was a surprise gift." ECF 14 at 3. In other words, even if Murray did not expressly admit to sending money to Officer Conley during the interview, presenting the video-recorded interview would have allowed the hearing officer to consider Murray's other suspicious statements. The court cannot find that the inability to present the video-recorded interview amounted to more than harmless error.

Nor does it appear that any statement from Officer Conley would have been likely to affect the decision. According to the completed investigative report, Officer Conley resigned amidst the investigation about three weeks prior to the disciplinary hearing. ECF 14 at 5. It is unclear what she might have said or whether she would have been willing to provide any statement. Even assuming that Officer Conley would have provided an exculpatory statement, it seems unlikely that the hearing officer would

6

have afforded it much credit considering the highly incriminating nature of the telephone conversations and the potential criminal liability faced by Officer Conley if she corroborated the conduct report. *See* Ind. Code § 35-44.1-3-5 (criminal offense of trafficking with an inmate).

The guilty plea and Murray's statement regarding Investigator's Mapp's retaliatory intent seem similarly unlikely to have moved the needle with respect to the outcome of the hearing. Murray does not dispute the veracity of the telephone conversations, and these conversations, by themselves, are highly incriminating. They also provide a sufficient impetus on their own for a correctional investigator to initiate an investigation. Further, the completed investigative report does not indicate that Investigator Mapp sought information on other offenders from Murray or that she had any other suspects for the trafficking incident that was the subject of her investigation. In sum, the inability to present a defense to the charges amounted to harmless error with respect to the finding of guilt.

The court has also considered whether the erroneously entered guilty plea affected the sanctions. According to departmental policy, Class A offenses may be sanctioned with a maximum of a loss of six months earned credit time and a demotion in credit class. ECF 12-8 at 40. The hearing officer sanctioned Murray with a loss of thirty days earned credit time – one-sixth of the maximum sanction -- and a demotion of credit class and noted the following reasons for the sanctions imposed: seriousness, frequency or nature, offender's attitude and demeanor during the hearing, and the degree to which the violation disrupted or endangered the facility. ECF 12-4.

Considering these sanctioning factors and the nature of the charge, it appears that the hearing officer imposed more lenient sanctions based on the entry of the guilty plea. Consequently, the erroneous entry of a guilty plea did not prejudice Murray with respect to the sanctions imposed. Therefore, the claim that he was not allowed to present a defense is not a basis for habeas relief.

Because Murray has not asserted a valid claim for habeas relief, the habeas petition is denied. If Murray wants to appeal this decision, he does not need a certificate of appealability because he is challenging a prison disciplinary proceeding. *See Evans v. Circuit Court*, 569 F.3d 665, 666 (7th Cir. 2009). However, he may not proceed in forma pauperis on appeal because the court finds pursuant to 28 U.S.C. § 1915(a)(3) that an appeal in this case could not be taken in good faith.

For these reasons, the court:

(1) DENIES the habeas corpus petition (ECF 1);

(2) DIRECTS the clerk to enter judgment and close this case; and

(3) DENIES Robert L. Murray leave to proceed in forma pauperis on appeal.

SO ORDERED on November 8, 2023.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT